IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

THERESA McEWEN,

                    Plaintiff,

        v.

UNITED STATES,

                    Defendant.

HONORABLE JEROME B. SIMANDLE

CIVIL NO. 03-167 (JBS)

**OPINION**

APPEARANCES:

Craig J. Hubert, Esq.
SZAFERMAN, LAKIND, BLUMSTEIN, BLADER & LEHMAN
Quakerbridge Executive Center
101 Grovers Mill Road
Suite 104
Lawrenceville, NJ 08648
        Attorney for Plaintiff

Christopher J. Christie
United States Attorney
        By:  Dorothy J. Donnelly, A.U.S.A.
402 East State Street
Room 430
Trenton, NJ 08608
        Attorney for United States

**SIMANDLE,** District Judge:

        This "slip-and-fall negligence" action was brought by

Plaintiff against the United States under the Federal Tort Claims

Act, 28 U.S.C. §§ 2671-80, arising from injuries sustained by

Plaintiff on June 23, 1998 while performing custodial work at

Fort Dix as the employee of an independent contractor.  Defendant

has moved for summary judgment.  The principal issue is whether

the United States is liable for a slippery floor condition which

allegedly caused injury to an employee of its independent floor maintenance contractor; for such liability to arise under New Jersey law, Plaintiff must demonstrate that the Defendant retained control over the manner and means by which the floor maintenance was performed or actively interfered with the manner or method of the work being performed.  Because under the circumstances of this case Plaintiff cannot meet this burden under any reasonable view of the facts, Defendant is entitled to summary judgment for reasons discussed herein.

## I.    BACKGROUND

Plaintiff Theresa McEwen was an employee of Kenyon Building Maintenance ("Kenyon"), who alleges she fell on a slippery floor at the Child Development Center at Fort Dix, New Jersey, a floor which her employer had the contractual duty to maintain.  Kenyon was awarded a contract by the United States Army in 1997 to clean the premises at Fort Dix, New Jersey, a property owned by the United States.  According to the contract, Kenyon was responsible for, among other things, mopping, sweeping, waxing and spray buffing all accessible floors.  (Def. Ex. 2, Part I, Sec. C, ¶¶ 2.13-2.16.)  The agreement provided: "the cleaning of lobbies, corridors, offices and restrooms resulting in a temporarily wet or slippery floor surface shall be accomplished so that it will not be necessary for personnel to cross the wet surface to gain access to other areas."  (Id. at ¶ 1.16.6.)  Similarly, the

2

agreement stated that "[a]fter being mopped, the floor shall have a uniform appearance, with no . . . standing water." (Id. at ¶ 2.15.) Kenyon was also required to apply "a uniform coating of non-skid floor finish." (Id. at ¶ 2.13.) The contract also required Kenyon to "furnish all materials . . . [and] equipment and tools necessary to perform the work defined in the contract." (Id. at ¶¶ 4.1, 4.5.) Kenyon's contractual duties thus included maintaining the floors in the Child Development Center.

Additionally, under the terms of the agreement: "All rules of safety which are or may be imposed upon the contractor by Federal, State or Municipal Code, and the applicable Installation Regulations shall be effectively carried out in the performance of the contract." (Def. Ex. 2 ¶ H.3.) Moreover, the contract required the Contractor to establish "a comprehensive safety program," maintain "all equipment and facilities . . . in accordance with safe engineering practices," and "control the work situation to minimize safety hazards." (Id. Part I, Sec. C, ¶ 1.16.2.) Kenyon was also responsible for "display[ing] . . . warning signs" such as "Caution – Wet Floor," "in all areas where custodial operations may cause traffic obstruction or personnel hazard." (Id. at ¶ 1.16.4.)

Plaintiff, Theresa McEwen, was employed by Kenyon as a custodial worker at the Child Development Center at Fort Dix. Plaintiff typically worked the day shift, between 7:30 A.M. and

3

4:00 P.M.  (Def. Ex. 6, Pl. Dep. Tr., 17:20-25.)  According to her deposition testimony, Plaintiff's responsibilities included cleaning out sinks, emptying trash and washing the floors in the kitchen.  (Id. at 16:1-17:3.)  Plaintiff maintains that with the exception of cleaning up spills that were reported, during the day shift she did not clean floors other than in the kitchen.[1] (Id.)  For example, Plaintiff testified that after the students ate breakfast, the teachers cleaned up the floors.  (Id. at 20:8-13.)  Moreover, Plaintiff maintains that when rain leaked from the ceilings, the teachers placed buckets to collect the water. (Id. at 58:19-21; 62:8-12.)

According to Darleen White, the Director of the Child Development Center at Fort Dix, she would contact Plaintiff if she needed maintenance support.  (Def. Ex. 7, White Dep. Tr., 61:18-19.)  For example, she testified it was Plaintiff's responsibility to mop up "the sheen," or other such slippery substances, that appeared on the floors.  (Id. at 61:21-24.)  In fact, the contract with Kenyon incorporated the terms of AR 680-10 paragraph 5-37(b), which provides: "Caregiving employees will not perform custodial services with the exception of wiping

---

[1] Plaintiff alleges that on the rare occasion that she switched with another employee and was forced to work during the evening shift, her responsibilities included washing all the floors.  (Id. at 18:1-6.)  Thus, during the day shift Plaintiff's employer, Kenyon, maintained the floors, although Plaintiff herself did not do floors other than the kitchen.

4

tables, sweeping floors, etc., after program activities and meal service, to maintain functional orderliness and cleanliness." (Def. Ex. 4.)  Thus, other than cleaning up after the children in the day care center, such as after spills, the caregivers were not to perform custodial duties; that is why Kenyon was hired.

Nonetheless, Judy Beard, an Assistant Director at the Child Development Center at Fort Dix, testified that she and a coworker kept a mop in Ms. Beard's assigned classroom to use in case of spills or other wetness on the floor.  (Pl. Ex. 2T, Beard Dep. Tr., 42:10-44-18.)  Ms. Beard testified that although it was her understanding that it was the cleaning person's responsibility to maintain the floors, she would handle spills when she didn't want to call a cleaning person.  (Id.)  In short, according to Ms. Beard:

> [W]e helped [Plaintiff] out by taking care of the floors in the morning, not calling her when children had spills and cleaned up those ourselves, and it was a big building and [Plaintiff] was the only custodial person so the two of us had an agreement along with our coworkers that we would clean up spills and [Plaintiff] would thank us for doing that.

(Id. at 73:22-74:6.)  Plaintiff does not allege she slipped in a spill caused by the children.

> [I]f the floors were humid and there was any humidity on the floors in the eating area, my coworker and I would mop the floors prior to her coming in to clean after lunch time.

(Id. at 78:17-21.)

On June 23, 1998, at approximately 7:30 A.M., Plaintiff allegedly slipped and fell while working at the Child Development Center, causing her to be injured.  There are inconsistencies in Plaintiff's account of the accident.  According to the Employee Report filled out by Plaintiff on July 2, 1998, Plaintiff "was stocking the restroom in Room 17 when [she] slipped on oil on the floor."  (Def. Ex. 1.)  The notice of tort claim filed by Plaintiff on March 24, 2000, however, states that "Theresa McEwen slipped and fell on a wet floor caused by a leaking roof which caused her to fall violently to the ground and hit her head on a standing locker."  (Def. Ex. 3.)  According to her deposition, Plaintiff was in a classroom with Ms. Beard and another teacher and their students when she slipped on a wet floor on her way to check the supplies in the bathroom.  (Def. Ex. 6, Pl. Dep. Tr. at 28:10-22.)  Plaintiff testified that there were buckets around the classroom to collect rain which caused the floors to be "moist."  (Id.)  According to Plaintiff, when Ms. Beard rushed to Plaintiff after Plaintiff fell, she too fell on top of Plaintiff.

Defendant acknowledges that at the time of the accident, "the hallways had a problem with a leaking roof."  (Def. Statement Uncontested Facts ¶ 41.)  Defendant also concedes that "the floor at the location of the accident was slippery during humid conditions."  (Id. at ¶ 42.)  According to Ms. Beard, this "humidity condition" was the result of condensation build-up,

which manifested itself with "little bubbles the size of a dime on the floor."[2]  (Pl. Ex. 2T, Beard Dep. Tr., 31:12-32:10.)  This condition persisted during the warmer months such as June when this accident occurred; in the winter months, the humidity condition was absent.  (Id. at 42:25-44:24.)  In fact, Ms. Beard testified that during the warmer months, she would mop the floor of her classroom sometimes more than once a day.  (Id. at 43:10-44:1.)  Contrary to her earlier allegations that she "slipped on oil the floor" or on a wet floor "caused by a leaking roof," Plaintiff now alleges that the floor was wet from humidity and condensation that Ms. Beard failed to mop up.  She alleges that Ms. Beard controlled the mopping of the floor in question during humid days, and that Ms. Beard negligently failed to provide her with a safe work area by failing to clean up the alleged condensation that made the floor especially slippery.

On January 15, 2003, Plaintiff filed this Complaint, alleging that she had "entered a classroom or other space" when she fell.  (Compl. ¶ 4.)  The Complaint alleges a claim for negligence against the United States under the Federal Tort Claims Act.  Defendant subsequently moved for summary judgment.

---

[2] Additionally, an investigation by the Army uncovered that some residual cleaning material was present on the floor where Plaintiff slipped and fell.  (Def. Statement Uncontested Facts ¶ 51.)  Any residual cleaning solution would have been the result of Kenyon's own cleaning activities; other than keeping a damp mop for spills, the Child Development Center did not maintain cleaning or waxing solutions, so far as the record reveals.

## II.   SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[3]  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

## III. DISCUSSION

Under New Jersey law, a landowner generally "has a non-delegable duty to exercise reasonable care for the safety of

---

[3] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

persons using the premises at his invitation." <u>Kandarge v.
United States Dep't of the Navy</u>, 849 F. Supp. 304, 310 (D.N.J.
1994) (quoting <u>De Los Santos v. Saddlehill, Inc.</u>, 211 N.J. Super.
253, 261 (App. Div. 1986)).  However, "[i]t has long been the
rule in New Jersey and elsewhere that one who hires an
independent contractor is not responsible for the latter's
negligent acts." <u>Cassano v. Aschoff</u>, 226 N.J. Super. 110, 113
(App. Div. 1988) (citing <u>Majestic Realty Associates, Inc. v. Toti
Contracting Co.</u>, 30 N.J. 425, 431 (1959)); <u>see</u> <u>Laird v. Nelms</u>,
406 U.S. 797 (1972) (holding that excluded from the Federal Tort
Claim Act's coverage are theories of strict liability and
vicarious liability for the torts of independent contractors).
Thus, when an independent contractor is hired to "carry on
activity which by its very nature involves a peculiar or high
risk of harm to the contractor's employee, the landowner is
generally not responsible for injuries sustained by the
contractor's employee in the course of his assigned duties."
<u>Kandarge</u>, 849 F. Supp. at 310 (quoting <u>Wolczak v. National Elec.
Products Corp.</u>, 66 N.J. Super. 64, 75 (App. Div. 1961)).

> The landowner may assume that the worker, or his
> superiors, are possessed of sufficient skill to
> recognize the degree of danger involved and to adjust
> their methods of work accordingly.  Thus the unimpaired
> line of holdings to the effect that the duty to provide
> a reasonably safe working place for employees of an
> independent contractor does not relate to known hazards
> which are part of or incidental to the very work the
> contractor was hired to perform.

Donch v. Delta Inspection Servs., Inc., 165 N.J. Super. 567, 574
(App. Div. 1979).

Thus, for example, in Kandarge, 849 F. Supp. 304, the court
held that the United States Department of the Navy could not as
a matter of law be liable to the employee of a contractor it had
hired to perform certain work at a government installation, where
the plaintiff's injuries were the result of a risk inherent in
the contracted work.  In that case, the plaintiff sustained
personal injuries while working in an excavation ditch when the
walls of the ditch collapsed.  It was undisputed that the parties
knew of the lack of shoring to support the walls; indeed, the
contractor was responsible for providing proper shoring.  In
granting summary judgment in favor of the defendant, the court
held that "[t]here is little doubt that the cave-ins were an
inherent risk of working on an excavation site," id. at 311, such
that plaintiff was injured as the result of known hazards which
were "part of or incidental to the very work the contractor was
hired to perform."  Id. (quoting Wolczak, 66 N.J. Super. at 75).

Similarly, in Rigatti v. Reddy, 318 N.J. Super. 537, 539
(App. Div. 1999), the court affirmed the decision below that
"defendants' employer and the owner of a building from which
plaintiff fell, did not breach its duty to provide plaintiff with
a reasonably safe place to work because the injury was a risk
incidental to the work plaintiff was hired to perform."  There,

10

the owner of a building hired a contractor to replace a section
of the building's roof "because it was old and a large section
had collapsed under the heavy snowfall the previous winter."  Id.
at 540.  On his first day on the job, the plaintiff, an employee
of the contractor, fell through a portion of the roof onto which
he and a coworker had climbed to retrieve a sheet of metal left
behind by another subcontractor.  Though the section of the roof
through which the plaintiff fell was not subject to the contract
between the contractor and the defendant, nor was it scheduled to
be replaced, the court held that the defendant property owner
"had no duty to eliminate the operational hazards which were
incidental to the very work [the contractor] was hired to
perform."  Id. at 542.

In Cassano v. Aschoff, 226 N.J. Super. 110 (App. Div. 1988),
the plaintiff was severely injured when struck by a falling tree
limb during the course of his employment with an independent
contractor engaged in a tree removal business.  The contractor
had been hired by two other defendants to remove a large tree
from their common property line.  Though the court found that the
independent contractor performed the job negligently and was
uninsured, it affirmed the trial court's conclusion that
liability could not be imposed on the property owners as a matter
of law.  Id. at 114.  The court held that "[e]ven if the work did
create a dangerous condition, the landowner's duty to invitees

11

does not by itself protect employees from the very dangers that their work creates." Id. at 115.

On the other hand, a landowner will not escape liability if the landowner retains control "over the manner and means by which the work is to be performed, [or] where the work constitutes a nuisance per se or where one knowingly engages an incompetent contractor." Cassano, 226 N.J. Super. at 113 (citation omitted). In determining whether a landowner is negligent, New Jersey courts have "stressed the degree to which the landowner participated in, actively interfered with, or exercised control over the manner or method of the work being performed at the time of the injury." Sanna v. John S. Sincak & Co., 209 N.J. Super. 60, 66 (App. Div. 1986) (citing Gibilterra v. Rosemawr Homes, 19 N.J. 166, 171 (1959); Wolczak, 66 N.J. Super. at 73). Thus, where a property owner exercises "control over and participates at the [contractor's] workplace being used at the time of the accident," a jury may be able to find that the property owner breached the delegable duty to provide a reasonably safe place to work. Sanna, 209 N.J. Super. at 66.

In Sanna v. John S. Sincak & Co., 209 N.J. Super. at 66, the defendant, a sponge-rubber carpet cushion manufacturer, had employed an outside contractor to remodel its factory over the course of several years. During that time, the factory owner would lend the contractor necessary equipment if it were

12

available.  The plaintiff was employed by the contractor and
working at the factory on an "emergency problem" when he
sustained injuries following a fall from a makeshift scaffold.
He and a co-worker had initially arranged a scaffold by using an
aluminum ladder (dismantled into two parts) supplied by the
contractor, as well as a forklift and some planks provided by the
defendant.  After working with this scaffold for about an hour,
one of the defendant's employees removed the borrowed forklift.
Another of the defendant's employees, at the plaintiff's request,
then provided the plaintiff with a ladder to use in place of the
forklift.  After an hour on this apparatus, it collapsed, causing
the plaintiff to severely injure his arm.  According to the
plaintiff, he suspected that grease on the aluminum ladder owned
by the contractor could have caused it to give way from the wall.
Additionally, there could have been grease or "slime" on the
floor upon which the scaffold had been erected.

The court reversed the lower court's dismissal, concluding
that "the plaintiff produced sufficient evidence of defendant's
control over and participation at the plaintiff's workplace being
used at the time of the accident to create a jury question on
whether defendant breached its nondelegable duty to provide a
reasonably safe place to work."  Id. at 66.  According to the
court, "[t]his control included first providing and then removing
the forklift from the jerry-rigged scaffolding, not providing

13

conventional scaffolding in the first place once it voluntarily had participated in the undertaking to help furnish scaffolding materials, and its general maintenance of the work area in the aspect of cleanliness. Id. at 66.

> If defendant had done nothing and plaintiff's employer [] had assumed sole control over the ladders and scaffolding used to gain access to the work area, plaintiff would have no case against defendant on this theory. But the evidence indicated that employees of the defendant knew plaintiff and his co-worker had created a makeshift scaffolding, partly from defendant's materials, in order to perform the job. . . . Once defendant undertook to supply parts of the scaffolding, especially in view of the past relations of defendant and [the contractor] where defendant frequently provided equipment to its contractor, and the emergency nature of the work, a jury could find that defendant exercised the requisite control over the jobsite to create a liability exposure.

Id. at 68; see Izhaky v. Jamesway Corp., 195 N.J. Super. 103, 107 (App. Div. 1984) (finding sufficient evidence of participation by the defendant landowner in the work electrical subcontractor had been hired to perform to create a jury question).

In McLaughlin v. United Steel & Wire Co., 1991 U.S. Dist. LEXIS 8718, at *5 (E.D.Pa. June 25, 1991), the district court, applying New Jersey law, recognized that the plaintiffs could recover for injuries sustained from an accident on the defendant's property by demonstrating that the defendant supplied the equipment that proximately caused the accident. The plaintiffs in that case were employees of a subcontractor hired to remove certain equipment from the defendant's property. To

14

reach the equipment, the plaintiffs placed a wire basket on the forks of a forklift, which they then elevated to a height at which they could work.  At some point, the basket slipped from the forks, and the plaintiffs fell some fifteen feet to the floor.  The parties disagreed about the ownership of the basket and the forklift.  The defendant also argued that regardless of ownership, they did not supply or grant the plaintiffs permission to use the basket or the forklift.

The court held that while proof of ownership, by itself, was insufficient to establish liability under New Jersey law, the plaintiffs could "show that the defendants supplied the equipment, or otherwise exercised a measure of supervision and control over the subcontracted work sufficient to justify holding them liable." Id. at *8.  However, since the plaintiff in that case "failed to present any evidence that would suggest that permission was given, to move from the inference that the fork lift and basket were owned by the defendant to the further inference that the defendant agreed that the equipment should be used by the plaintiffs would be unreasonable." Id.  Accordingly, the court granted summary judgment in favor of the defendant.

In this case, Plaintiff has not offered sufficient proofs to allow the factfinder to determine that Defendant, through its employees, either participated in, actively interfered with, or exercised control over the manner or method of the work being

performed at the time of the injury to create a liability exposure.  Defendant concedes that at the time of the accident, the hallways had a problem with a leaking roof and the floor at the location of the accident was slippery during humid conditions.  Moreover, according to Ms. Beard, this "humidity condition" was the result of condensation build-up, which persisted during the warmer months such as June.  Finally, Plaintiff testified that at the time of the accident, teachers had placed buckets around the classroom to collect rain which caused the floors to be moist.  Assuming that the floor was wet from rainwater or humidity, the fact remains that the duty to mop the floors and maintain them free of such hazards rested with Ms. McEwen's employer, Kenyon.  The day care caregivers were not custodians, and they performed no custodial duties other than mopping up when a child spilled something, which isn't alleged here.  That Ms. Beard and Ms. McEwen may have "agreed" that Ms. Beard would clean up spills has no bearing on this case, where the fall was not caused by such a spill.  Similarly, that the caregivers may have occasionally augmented Kenyon's floor care efforts when Kenyon wasn't available to mop up condensation could not, as a matter of law, displace Kenyon's clear duties to mop and maintain this very floor under its contract.  There is no evidence, unlike Sanna, supra, that Defendant's personnel provided equipment to Kenyon or took control over the worksite to

the exclusion of Kenyon; indeed, Kenyon retained control over this floor at all times, including the moment of Ms. McEwen's accident.  The direct interference in the contractor's performance, present in Sanna, is absent here.

Similarly, in Izhaky, supra, the defendant's employees had actively interacted with the plaintiff electrician by removing the switch box from the wall before the plaintiff began his work and was electrocuted.  Izhaky, 195 N.J. Super. at 107.  In the present case, no evidence suggests that Ms. Beard actively interfered with the mopping of the floor.  At most, Ms. Beard failed to mop it that day.  But the duty to do so was Kenyon's, not Ms. Beard's.  Such an omission by a landholder to perform the very task which the landholder contracted the independent contractor to perform does not rise to the level of direct interference in Kenyon's contractual tasks and duties.

Similarly, Plaintiff maintains that when rain leaked from the ceilings, the teachers placed buckets to collect the water. (Id. at 58:19-21; 62:8-12.)  Moreover, Plaintiff testified that after the students ate breakfast, the teachers cleaned up the floor area.  (Id. at 20:8-13.)  Judy Beard, the teacher assigned to the classroom where Plaintiff fell, testified that she and a coworker kept a mop to use in case of spills or other wetness on the floor.  Ms. Beard also testified that although it was her understanding that it was the cleaning person's responsibility to

17

maintain the floors, she would handle spills when she didn't want
to call a cleaning person.  Again, these circumstances did not
create a duty owed by the United States to Kenyon's employees,
whose job it was to maintain the floors, whether the wetness was
caused by condensation or a leaking roof.  Kenyon had the duty to
remedy these wet floor conditions by contract, and even when all
favorable inferences are given to Plaintiff's factual
allegations, any omission by a caregiver in mopping the floor
could not reasonably be found to have displaced Kenyon's duties
where Defendant's employees did not direct Plaintiff's work,
interfere with Plaintiff's work, or provide defective equipment
or instruction for Plaintiff's work.

Accordingly, the Court holds that Defendant is entitled to
summary judgment because Plaintiff, as an employee of the
independent contractor, alleges injury from floor conditions
which are part of or incidental to the very work that the
contractor was hired to perform, in the absence of direct
interference or supervision of the contractor's performance.

## IV.   CONCLUSION

Because there is no material dispute of fact as to "the
degree to which the landowner participated in, actively
interfered with, or exercised control over the manner or method
of the work being performed at the time of the injury,"  Sanna,

209 N.J. Super. at 66, the Court will grant Defendant's summary

judgment motion.  An appropriate Order will be entered.


**April 25, 2006**             **s/ Jerome B. Simandle**
Date                          JEROME B. SIMANDLE
                                   U.S. District Judge